UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

United States of America

                :

                :

        v.

                :   19 CR. 675 (VM)

Bill Tsai,

                :

         Defendant.

                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING SUBMISSION
## ON BEHALF OF DEFENDANT BILL TSAI

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

I.   PROCEDURAL HISTORY................................................................................................2

II.  NATURE AND CIRCUMSTANCES OF THE OFFENSE ...............................................3

III. SENTENCING GUIDELINES..........................................................................................4

IV.  SENTENCING FACTORS ................................................................................................4

    A.   Personal History and Characteristics ......................................................................5

        1.   Family and Educational Background ................................................... 5

        2.   Brief Career ......................................................................................... 7

        3.   Post-Arrest Volunteering, Self-Reflection, and Employment.............. 8

        4.   Personal Characteristics ...................................................................... 9

        5.   Viral Social Media Shame ................................................................. 12

    B.   The Need to Promote the Purposes of Sentencing.................................................14

    C.   A Non-Custodial Sentence is Proper in this Case.................................................16

        1.   A Non-Custodial Sentence Achieves the Goals of the Guidelines ..... 17

        2.   A Non-Custodial Sentence Would Achieve Sentencing Parity ........... 18

    D.   The Need to Provide Restitution...........................................................................19

V.   CONCLUSION.................................................................................................................20

4840-0522-8461

## PRELIMINARY STATEMENT

Bill Tsai, a 23-year-old recent college graduate, is before the Court for sentencing on January 17, 2020 for engaging in insider trading, for which he pled guilty to one count of securities fraud on September 19, 2019.

In the four months since his arrest, Bill Tsai has learned the terrible consequences of his poor judgment: a highly public arrest, a night in jail, an arraignment, a civil lawsuit brought by the Securities and Exchange Commission ("SEC"), and the immediate termination of his employment as an analyst at a premier financial institution—the dream job for which he came to the United States and went to college.  He immediately accepted responsibility for his actions, and in quick succession, waived discovery, pled guilty to a felony, consented to forfeit his gains from insider trading, and settled the civil lawsuit brought by the SEC that will now lead to a bar from the securities industry.  Throughout this process, Bill has been widely excoriated on social media, bringing shame to him, his family, his friends, and his schools, both in the United States and back home in Taiwan.

As demonstrated by the heartfelt letters submitted by family, friends, prior employers, and the supervisor at the soup kitchen where he has volunteered for years—long before he engaged in insider trading—his conduct is not reflective of his true character.  Bill is a caring, loyal, and devoted son and friend, whose conduct flies in the face of everything he worked so hard to achieve and the values his family instilled in him.  Unfortunately, Bill was too readily influenced by the extravagant lifestyle of some young investment banking professionals, and quickly incurred tens of thousands of dollars in credit card debt.  Too embarrassed to ask his family for help, he instead tried to cover his burgeoning debt by trading with inside information. Words cannot express his heavy remorse for his wrongdoings.  Bill will live with the

1

consequences of being a convicted felon for the rest of his life.  He now works two jobs, one as a customer service representative and another at a restaurant waiting tables, in an effort to satisfy the remainder of the consent order of forfeiture of $125,997 from his insider trading.

As the Court considers a just and appropriate sentence for a young man who was only 22 years old when he engaged in the conduct that brings him before this Court, we respectfully submit that Bill merits leniency based on his youth, lack of criminal history, record of volunteering and giving back to the community, willingness to accept responsibility for his actions, and the severe collateral punishment that he has suffered and will continue to suffer. Indeed, the Presentence Investigation Report (the "PSR") has endorsed such leniency, recommending a non-custodial sentence imposing a three-year period of probation, to include three to six months' home confinement and 400 hours of community service.  Under the facts of this case, and an evaluation of the factors set forth in Section 3553(a), we respectfully submit that such a sentence is sufficient, but not greater than necessary to promote the goals of the United States Sentencing Guidelines (the "Guidelines").  Such a sentence would allow Bill to continue to work to pay the debt owed to the Government and to give back to the community. Such a sentence would also be consistent with sentences imposed on similar offenders.

## I.    PROCEDURAL HISTORY

Bill was arrested on Sunday, August 11, 2019, on a complaint charging one count of insider trading securities fraud.  *See* Dkt. No. 1.  After spending a night in jail, he was arraigned on that charge on Monday, August 12.  Bill immediately accepted responsibility for his conduct. Within days, with Bill's authorization, his attorneys met with the Government to communicate Bill's intention to resolve the matter.  Then in short order, Bill consented to the seizure of funds in his brokerage account, consented to the waiving of Indictment and the filing of the Information in this case, and consented to proceed before a magistrate judge.  On Thursday,

September 19, he consented to the Government's preliminary order of forfeiture for $125,997 and pled guilty to his criminal conduct before Magistrate Judge Ona T. Wang.  *See* Dkt. Nos. 8, 10, 11, and 15.

Bill's conduct also caused the SEC to file a civil action against him on August 12, 2019. *See Securities and Exchange Commission v. Bill Tsai*, No. 19 CV 7501 (GHW), Dkt. No. 1.  Bill waived discovery and subsequently agreed to a settlement in principle with the SEC several months ago.  After the SEC completed its internal approval process, the parties submitted the consent and proposed final judgment for consideration by Judge Gregory H. Woods on December 13, 2019; Judge Woods entered final judgment on December 16, 2019.  *See* Dkts. 14 & 16.  As part of that final judgment, Bill was permanently enjoined from engaging in future securities violations and ordered to disgorge approximately $100,587.32 (an amount against which he will receive credit for his forfeiture in this matter).  Additionally, the SEC has initiated an administrative proceeding that will result in a bar from the securities industry Bill worked so hard to enter.

## II.   NATURE AND CIRCUMSTANCES OF THE OFFENSE

Bill was 21 when he interned at his former employer (the "Bank") and 22 when he started working there full-time.  He became enamored with what he thought was the lifestyle of young investment banking professionals and incurred substantial debt.  This caused him to exercise bad judgment and trade using material non-public information that he obtained from the Bank to get money to pay his debt.  In total, Bill's unlawful trades in multiple securities resulted in a gain of $125,997.  Bill did not contest the Government's seizure of his brokerage account and consented to the Government's preliminary order of forfeiture of this unlawful gain in September 2019. Beyond forfeiting his proceeds, Bill has also forfeited his future in the securities industry that was to be his lifetime career.

3

III.   **SENTENCING GUIDELINES**

According to the Plea Agreement dated September 11, 2019, the Government and Bill

stipulated to the following:

- The November 1, 2018 version of the Guidelines applies to Bill's sentence;

- Guidelines § 2B1.4 ("Insider Trading") applies to Bill's conduct;

- Under § 2B1.4, Bill's base offense level is 8, one to two levels higher than the base offense level for non-insider trading fraud under § 2B1.1; (Total = 8)

- Because Bill gained more than $95,000 but less than $150,000, the offense level increases by 8 levels pursuant to §§ 2B1.4(b)(1) and 2B1.1(b)(1)(E); (Total = 16)

- A 2-level enhancement for abuse of trust pursuant to § 3B1.3 ("Abuse of Position of Trust or Use of Special Skill") is applied because "defendant abused a position of private trust in a manner that significantly facilitated the commission and concealment of the offense;" (Total = 18)

- Because Bill has clearly demonstrated his acceptance of responsibility for months, beginning shortly after his arrest, a 2-level reduction is warranted pursuant to § 3E1.1(a) ("Acceptance of Responsibility"); (Total = 16) and

- Because Bill permitted the Government to avoid preparing for trial and permitted the Government and the Court to allocate their resources efficiently—by accepting responsibility, waiving discovery, waiving indictment, consenting to the filing of an information, consenting to the seizure of funds in his brokerage account, providing timely notice of his intention to enter a guilty plea, consenting to proceed before a magistrate judge, consenting to the Government's preliminary order of forfeiture, and pleading guilty—Bill is eligible for an additional 1-level reduction pursuant to § 3E1.1(b); (Total = 15).

Bill's applicable Guidelines offense level is thus 15.  The corresponding Guidelines range

is 18 to 24 months' imprisonment.  The Court may also impose a fine between $7,500 and $5

million for a level 15 offense under the Guidelines, pursuant to § 5E1.2.

IV.   **SENTENCING FACTORS**

A sentencing court must consider the sentencing factors enumerated in 18 U.S.C.

§ 3553(a).  The purpose of 18 U.S.C. § 3553(a) is to impose a sentence that is "sufficient, but not

4

greater than necessary," to comply with the four purposes of sentencing set forth in Section 3553(a)(2). *See Kimbrough v. United States*, 552 U.S. 85, 111 (2007); *United States v. Corsey*, 723 F.3d 366, 376 (2d Cir. 2013) (remanding for resentencing where district court "gave only a passing mention to any of the section 3553(a) factors"). This Court should not "presume that a Guidelines sentence is reasonable." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). Moreover, as reaffirmed by the Supreme Court, "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 477 (2011) (citations omitted). Consideration of the Section 3553(a) factors in this case supports a non-custodial sentence as recommended by the Probation Office. Indeed, we respectfully submit that a custodial sentence would be greater than necessary to comply with the purposes of sentencing.

### A.    Personal History and Characteristics

#### 1.    Family and Educational Background

Bill was born in Queens in 1996, to a first-generation family of Taiwanese Americans. His family moved back to Taiwan when Bill was one year old. After Bill's birth, his father continued working and his mother immediately left her job in business to become a full-time Mom, raising the family and caring for Bill's grandparents. Bill's family primarily spoke Taiwanese as he grew up. Bill's parents raised him to appreciate the centrality of family and filial piety, the value of education, and the importance of a career—themes demonstrated in many of Bill's letters of support.[1]

As those letters describe, Bill is also a kind-hearted and compassionate young man. He is a committed mentor to others and is dedicated to his schools. He is a caring and dependable friend, and someone who has helped others, informally, through student leadership roles and

---

[1]    Letters of support are included in Exhibit A.

through his years of volunteering.  The conduct that brings him before this Court is antithetical to Bill's values and grossly out of character with the kind of person his friends and family know him to be.

Bill attended a school in Taiwan from 2001 through 2014 for elementary, middle, and high school.  During school, Bill developed close relationships with his peers and many of their parents, as demonstrated by his many letters of support.  Bill applied himself in school and was a good student.

In 2014, soon after turning 18, Bill left his family and friends in Taiwan and moved to New York to attend New York University's Stern School of Business.  At NYU, Bill made close friends, served as a mentor to undergraduates, and helped fellow Taiwanese Americans create support networks and acclimate to New York City.  While in college, Bill also began spending his Saturday mornings volunteering at a soup kitchen, where he worked with people who are homeless, providing food and a genuine human connection to those looking for both.

At NYU, reflecting his focus on building interpersonal relationships and friendships, Bill's peers eventually elected him as the Student Council President.  This was not a ceremonial position for Bill—he cared deeply about the student body generally, in ways that his support letter writers speak to individually.  Bill's two priorities during his time on the Student Council were (1) "to continue to foster a collaborative community where everyone feels supported" by reinforcing student health and wellness and "mak[ing] sure our community knows what resources exist to support them," and (2) "to connect upperclassmen and underclassmen to each other in a different way than they might be able to do though clubs.  We truly believe that the value of being a member of the Stern community is in the relationships you build and in your advocacy and inclusion of others.  We have had over 80 mentor-mentee pairings of all majors

6

and interests."  NYU, "Humans of Stern: Bill Tsai" (Nov. 16, 2017)

(https://www.stern.nyu.edu/programs-admissions/undergraduate/stern-advantage/news/humans-stern-bill-tsai).  Bill is remorseful for his bad judgment for numerous reasons, but his failure as one of the leaders of the NYU student community and his jeopardizing of many of the relationships he built while at NYU are two of the most painful.

In addition to his Student Council leadership role at NYU, Bill also worked as an orientation leader during his junior and senior years, helping integrate new arrivals to the Stern community.  He would spend a few hours every Friday with a group of 60+ Freshmen students for their first semester of college, guiding them through coursework, transitioning to college life, advising on how to discover lifetime friendships at NYU, and providing a framework for how to be successful at Business School.  At the same time, he continued to apply himself academically and graduated in May 2018 with a Bachelor of Science in Business.

Bill worked every summer while in college.  In 2015, he interned in the Asian offices of two large companies.  In 2016, he secured his first jobs in the U.S., working at a technology company in California for May and June and then at a financial institution in New York for the remainder of the summer.  In the fall of 2016, Bill's hard work earned him an internship position with a premier Wall Street financial institution for the following summer.  Bill had worked towards this goal since he was in high school.  His decision to leave Taiwan and his family to attend an undergraduate business school in the United States shows how much the opportunity for a position in the U.S. financial industry meant to him.

### 2.    Brief Career

Bill interned at the Bank in the summer of 2017 and received an offer for full-time employment.  Following his graduation in 2018, Bill began working at the Bank full-time in July.  He was assigned to a corporate banking group with roughly 30 people.  The group's clients

would typically request financing for capital market transactions they intended to undertake—mergers, acquisitions, initial public offerings, etc.  Bill's group would assess the client's request, structure the appropriate credit facility, and obtain the necessary internal approvals for the client to receive financing.

Although he hoped to advance over time into a client-facing role, Bill's responsibilities for the year he was employed by the Bank were exclusively internal.  As the most junior person in his group, he helped track client requests and the approval status of those requests on a variety of internal computer systems and helped prepare materials for more senior members of his group to use in internal committee presentations and at client meetings. The numerous second-year analysts, associates, vice presidents, directors, and managing directors above him would review and revise all his work.  Bill deeply regrets breaching the duty that he owed the Bank and its clients.

### 3.      Post-Arrest Volunteering, Self-Reflection, and Employment

On August 11, 2019, Bill's career in finance ended when he was arrested for trading using material non-public information.  The Bank terminated his employment the next day.  Bill's poor judgment and his resulting criminal conduct demonstrate how far he strayed from the values his family instilled in him.

Bill's mother arrived the week he was arrested from Taiwan and has been his rock since his arrest, staying with Bill and imposing a strict structure on his daily routine.  *See* PSR ¶ 42 and Addendum at 18 (describing Bill's living situation).  In the weeks following his arrest, Bill quickly accepted responsibility for his conduct, reflected extensively on his terrible judgment and the consequences it brought, and has attempted to return to his core values.  He has continued volunteering on Saturdays at the soup kitchen, as he had done while in college and

4840-0522-8461

while working at the Bank. He also began looking for employment outside of the securities industry and for additional volunteer opportunities.

In September, realizing that he would almost certainly need to satisfy severe criminal and civil penalties in the two actions against him, Bill began applying to dozens of jobs. He received several interviews, fully disclosed the fact that he had committed securities fraud and was a convicted felon, and quickly learned the impact of being a convicted felon. However, he eventually received two job offers from people who knew him. Since October, Bill has been working at a truck parts supply company during the day as a customer service representative, where he helps customers order and receive the parts they need in a timely manner. Soon after starting his first job, Bill obtained a second job at a restaurant in New York City, where he works a long 12-hour shift on Sundays and holidays.

That Bill's jobs came from friends and family who were willing to step in to help him move forward and give him a second chance is indicative of the kind of person Bill is. His determination to find employment—outside of his dream industry—is evidence of Bill's resilience and understanding that he needs multiple jobs to survive and pay his debts. His continued commitment to volunteering at the soup kitchen, and more recent volunteer work teaching English as a second language to immigrants every Thursday evening through a New York Cares program, are reflective of his efforts to return to his core values.

### 4.   Personal Characteristics

Although Bill is relatively young, he has developed a remarkable number of close friendships and relationships with both his peers and adults, many of whom wrote letters describing his character. As these individuals attest, Bill's conduct does not reflect how Bill was raised, nor the man he is becoming.

4840-0522-8461

The executive director of the soup kitchen, a former financial professional, writes (Ex. A at 5):

> I do understand the seriousness of Bill's crime. . . . Bill's 'wherever you need my help' approach is always appreciated. In particular, I remember him never hesitating to accept, (in fact, raise his hand for) the less popular task of washing dishes. . . . As a sentence is being considered, please take into consideration his time spent volunteering with us.

A childhood friend who has known Bill for fifteen years, writes about both the kind of person Bill is and his remorse for committing the crime that he did (*Id.* at 15-16):

> I have known Bill to be kind, reliable, and generous. . . . He is the type of person who will offer a helping hand without being asked. . . . If I was experiencing any personal issues, he was there to lend an ear and offer his advice. He demonstrated a level of reliability and care for me akin to a family member. . . . I have witnessed Bill extend these gestures to many others. For instance, he volunteers at a soup kitchen on Saturdays and I know much of the fulfillment he gets from his time there is the genuine connections he makes with new people. Through large or small gestures, Bill makes people feel acknowledged and respected. . . .
>
> When I first heard about Bill's situation, I was in disbelief. It was inconsistent with the character of the friend that I know. However, I am aware that he has pleaded guilty to insider trading. When Bill confessed to me, he expressed deep remorse over the serious lack of judgment he exhibited. His primary concern was the pain that he had caused to his loved ones and his community. Bill has always been determined to better his community and the people around him. I have every confidence that he will work hard to examine and atone for his behavior so that he will not make this grave mistake again.

Another childhood friend, writes about how committed Bill is to his friends and family and how, as she was adjusting to post-college life (*Id.* at 13-14):

> Bill quickly became my main support pillar. . . . Not only did he cheer me up during my loneliest moments, he also provided the fuel I needed to continue challenging myself and take the risks I wanted to jump on. There was a period where I felt undervalued and taken advantage of at work, but still saw considerable value in staying; Bill encouraged me to follow my instincts even though everyone else said otherwise. Through our frequent, sometimes hour-long conversations, I quickly saw that Bill is a wholehearted giver who doesn't expect anything in return. . . .
>
> Those of us who know Bill have and will always see him as a caring, generous, and loving dear friend. . . . Having grown up with Bill, I know without a shadow of a

10

doubt that this event is not an accurate reflection of his character. . . . It's my hope that our letters for Bill will prove he is not defined by this singular event, but by all his other positive deeds and generous gestures.

A college friend, shares his observations about Bill's positive impact with individuals and communities at NYU (*Id.* at 10-11):

> Bill was very genuine in his friendships and even empathetic in the way he always put people first and maintained his friendships.  He served as a mentor at the Stern School of Business and was generous with his time and experience.  He helped younger students navigate the academic and sometimes emotional challenges of the rigorous programs at NYU and the adjustment to life in the city. . . .  I believe Bill fostered a positive and collaborative atmosphere among those in the communities where he had an influence. . . . I know that he is deeply remorseful for his actions that violated the law, and he realizes that his actions have affected others as well.

The Senior Vice President (Asia) of Costco Wholesale Inc., who has known Bill since elementary school and supervised Bill as a summer intern, draws on his experience disciplining employees who make bad decisions and urges the Court to provide Bill a second chance, writing that Bill is (*Id.* at 3-4):

> a very caring and selfless person. . . . generous and kind. . . . grounded and [] loyal to friends from childhood . . . . who made a huge judgement error. . . [he] is already[] remorseful for what he has done wrong and will add value to the people he engages to make them better if he is allowed to reenter society sooner.  Allow him a second chance, you'll not regret your decision.  Believe me, this has been a huge learning lesson for Bill Tsai, but I know he'll be a better person, making better decision going forward and helping those around him not to do the same thing.

A long-time friend to Bill's family, and a Board Member of his high school's Parent Teacher Association, describes the kind of person Bill is, his remorse for his crime, and how she will support Bill's second chance as he rebuilds his life (*Id.* at 12):

> Ever since he was young, he has worked diligently to keep his grades up, made himself known for his friendliness and kindness, taken on leadership roles, and become an integrated part of the community.
>
> I was saddened to hear about Bill's recent actions because I know they do not reflect him as a person.  Since August, he has expressed to me his heavy remorse and admitted his wrongdoings.  I am willing to support him after his legal troubles as

11

Bill reevaluates his life's direction and dedicates himself to the process of reform.
Bill is a sincere, kind, and conscientious boy. . . .

Bill understands that he has done wrong; that in losing many of the good influences
around him, he lost his way and let his family and friends down.  More than that, he
recognizes his terrible mistake as an opportunity to learn a valuable lesson. Ever
since this incident, Bill has accepted responsibility over his actions, and I have full
faith that he will keep this lesson close to this heart for the rest of his life.  As one
of the mentor figures in his life, I will be there for him as he commits to rebuilding
himself, his principles, and his directions in life.

Bill is intensely remorseful for his actions and recognizes that he is fortunate to

have such loving support of family and friends who are helping him return to his core

values and be a good citizen who gives back to his community.

### 5.    Viral Social Media Shame

Bill's conduct has generated extensive publicity, bringing shame to Bill, the institutions

where he attended school and worked, and his family back home in Taiwan.  As many of his

letters of support note, Bill was in many ways a model son and student leader.  His public

profile—as the former student body president of Stern—led to devastating public criticism of his

poor judgment:

- "Former NYU Business School Standout, New to Wall Street, Charged With Insider
  Trading" (https://www.wsj.com/articles/former-nyu-business-school-standout-new-to-
  wall-street-charged-with-insider-trading-11565640125);

- ". . . Analyst Faces Insider Trading Case Year After Undergrad B-School" (Aug. 12,
  2019) (https://www.bloomberg.com/news/articles/2019-08-12/junior-analyst-bill-tsai-
  accused-by-u-s-with-insider-trading);

- ". . . Analyst Was Just Charged with Insider Trading Barely A Year After Finishing
  Undergrad" (Aug. 12, 2019) (https://markets.businessinsider.com/news/stocks/rbc-
  analyst-bill-tsai-insider-trading-charge-year-after-graduation-2019-8-1028439190);

- "Local Recaps: Recent Stern Grad Busted For Investment Fraud – Bill Tsai could be
  facing a Stern punishment as a result of his crimes" (Sept. 3, 2019) ("In other news, it's
  almost as if the brand of ethically ambiguous capitalism that business schools, including
  NYU Stern, have become notorious for propagating can be absorbed by the students of
  such institutions and eventually lead them to engage in criminal, fraudulent activities.

Who would've thought?") (https://nyulocal.com/recent-stern-grad-busted-for-investment-fraud-a850f9311b9a);

- "Newly-Minted Investment Banker Charged With Old School Insider Trading" (Aug. 12, 2019) ("We're not big on research but it has to be some kind of record to be under federal indictment for insider trading less than 15 months after graduating from college. So, congrats to Bill Tsai on making history!") (https://dealbreaker.com/2019/08/young-bill-tsai-accused-of-old-school-insider-trading);

- "Recent NYU Grad Charged With Insider Trading" (Aug. 12, 2019) (https://poetsandquantsforundergrads.com/2019/08/14/recent-stern-grad-charged-with-insider-trading/);

- "Manhattan U.S. Attorney Announces Insider Trading Charges Against Analyst at Investment Bank (Aug. 12, 2019) (https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-insider-trading-charges-against-analyst-investment-bank); and

- SEC Charges Investment Banking Analyst with Insider Trading (Aug. 16, 2019) (https://www.sec.gov/litigation/litreleases/2019/lr24568.htm).

Beyond this mainstream coverage, Bill has been personally attacked on numerous chat rooms and social media outlet in a distasteful manner that is not appropriate to put before the Court. The impact of this social media attention is demonstrated in one of the letters submitted to the Court, in which a friend describes as follows:

> In just four weeks, Bill went from a six-figure job to a double-shift of servicing tables at a local restaurant. In just a month, he got back on his feet when it seemed that every national news outlet, the entire NYU community, and his entire support system was against him. I went to go check up on Bill during one of his shifts at the restaurant and watched from the window before stepping inside. I recognized a group of younger NYU Stern students that Bill personally mentored during his time at the school sitting at a table that he was servicing. As he walked away, they started to silently mock him, take pictures of him on social media and purposefully treated him without a drop of human decency. I was utterly shocked. In that moment, Bill showed his true self: he did not break, he did not lose his optimism; he treated them with the respect he has shown to every person he has ever interacted with. In that moment, I knew that Bill will always be inherently a better man than most.

Ex. A at 8-9.

**B.      The Need to Promote the Purposes of Sentencing**

In light of Bill's age, immediate acceptance of responsibility, complete forfeiture of gains, securities industry bar, and online shaming, we respectfully submit that the Probation Office's recommendation of a non-custodial sentence with a term of home confinement and extensive community service would be appropriate and not greater than necessary to meet the goals of sentencing.

When considering the factors set forth in 18 U.S.C. § 3553(a), the proposed sentence reflects the seriousness of offense and provides just punishment.  Bill was arrested for his conduct, imprisoned overnight, sued by the SEC and fired from his job the next day, pled guilty to criminal charges and agreed to forfeit the $125,997 shortly thereafter, and will now bear the many collateral consequences of being a convicted felon for decades to come.  The SEC will bar Bill from the industry that he worked so hard to enter.  In interviewing for potential job opportunities, Bill has learned that his felony conviction forecloses him from many positions. Because of his crime, mainstream financial institutions have refused to do business with him and closed his credit card and bank accounts.  These are just the beginning of the consequences that Bill's conduct will have over the course of his life, and vividly demonstrate the seriousness of the offense.

The law permits a non-custodial sentence and we respectfully submit that, under the facts of Bill's case, such a sentence promotes respect for the law.  Here, Bill quickly accepted responsibility for what he had done, under both criminal and civil statutes.  He has expressed his remorse to family and friends in the months since.  Bill has also painfully learned the direct and collateral consequences of his conduct.  Imposing a non-custodial sentence with a term of home confinement and extensive community service recognizes that incarceration would not be the most effective punishment in this case.

14

A non-custodial sentence also affords adequate specific deterrence when combined with a term of home confinement and extensive community service.  Bill has learned an excruciating lesson.  His conduct brought shame on himself, his family, and his schools.  The continuing support of his family and friends will ensure Bill never exercises such bad judgment again.  As a family friend notes in her letter, "I have full faith that he will keep this lesson close to this heart for the rest of his life.  As one of the mentor figures in his life, I will be there for him as he commits to rebuilding himself, his principles, and his directions in life."  Ex. A at 12.  It is inconceivable that Bill would commit another crime, let alone securities fraud, again.  Shortly, Bill will also be barred from the securities industry by the SEC and will never again be in a position to misuse material nonpublic client information.  Additionally, individuals like Bill, who have no criminal history points and no prior contact with the criminal justice system, pose the lowest recidivism risk among all categories of federal offenders.  *See* U.S. SENTENCING COMM'N, THE PAST PREDICTS THE FUTURE: CRIMINAL HISTORY AND RECIDIVISM FOR FEDERAL OFFENDERS 6 (Mar. 2017) ([https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12](https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12)).

We respectfully submit that a non-custodial sentence with a term of home confinement and significant community service—in light of the other collateral punishment imposed on Bill—also accomplishes significant general deterrence.  *See also,* Gary Kleck, *et al.*, *The Missing Links in General Deterrence Theory*, 43 Criminology 623 (2005) (finding "generally no significant association between perceptions of punishment levels and actual levels" suggesting that "increases in punishment levels do not routinely reduce crime through general deterrence mechanisms.").  Bill's unlawful conduct resulted in a day in jail, massive negative publicity generated by his arrest, a criminal prosecution, a felony conviction, a civil lawsuit, two forfeiture

15

orders, an outstanding $30,000 debt to the Government, and an administrative processing that will shortly bar Bill from his chosen industry.  The long-term consequences of Bill's conduct—especially his lifetime status as a felon, bar from the securities industry, and lifetime of online disgrace—will effectively deter other individuals from similar conduct.  In particular, the internet humiliation that Bill has only begun receiving will serve as a continual reminder of the consequences of such unlawful conduct.  The very public penalties that Bill has borne because of his conduct have sent a powerful message of deterrence to other would be white-collar criminals.

Finally, we respectfully submit that a custodial sentence would be greater than necessary to provide correctional treatment.  As noted in the PSR, Bill has no physical, mental, emotional, or substance abuse issues.  PSR ¶¶ 43-46.  Bill needs to continue refocusing on the values that his family instilled in him, those that his lifestyle and misguided financial perspective made him lose sight of.  He has increased his volunteering, is working two jobs, and has the support of his mother, who plans to remain in the U.S. with Bill.  *See* PSR ¶ 42 and Addendum at 18 (describing Bill's living situation).

Bill has invested in—and meaningfully contributed to—every community he has been part of, as a son, as a student, as a friend, and as a volunteer.  We respectfully submit that the public interest would derive more value at a far lower cost, by allowing Bill to live, work, and volunteer in his community, rather than incurring the cost of incarceration.  *See* PSR ¶ 71 (stating that the annual cost of supervision by probation officer is $4,472, while the annual cost of incarceration is between $34,493 and $37,448).

## C.    A Non-Custodial Sentence is Proper in this Case

We concur with the Probation Office that a non-custodial sentence, including a term of home confinement and extensive community service, is appropriate.  The facts of this case, as well as Bill's education, volunteerism, and lack of criminal history, warrant leniency.  *See*

PSR ¶ 77.  We also agree with the remainder of the Probation Office's sentencing recommendations:  that Bill forfeit the money to which he has agreed and pay a special assessment, but that he not receive a term of supervised release, nor pay a fine.  PSR Addendum at 17.  Accordingly, we respectfully urge the Court to impose the sentenced recommend by the Probation Office.

### 1.    A Non-Custodial Sentence Achieves the Goals of the Guidelines

The statutory purposes of sentencing are contained in Section 3553(a) and, as the Probation Office notes, the Government and Bill agreed in the plea agreement that either party could seek a sentence outside of the stipulated guidelines range based upon the factors in 18 U.S.C. § 3553(a).  *See* PSR ¶ 5(c)(iii); Plea Agreement at 3.  The Probation Office's recommended non-custodial sentence—inclusive of a term of home confinement, hundreds of hours of community service, an order of forfeiture, and a special assessment—fully meets the statutory purposes and thus satisfies the Guidelines.

 As the Commentary to the Guidelines notes, "[p]robation may be used as an alternative to incarceration, *provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing*, including promoting respect for law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant."  Guidelines, Ch. 5, Pt. B, Introductory Commentary (emphasis added).

The Guidelines specifically note that "[h]ome detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment."  Guidelines § 5F1.2.  Home detention would require that Bill "be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, educational or training programs, and such other times as may be specifically authorized."  *Id.* at

17

n.1.  Finally, Bill is already fulfilling a usual condition of home detention—employment.  As the Guidelines note, "the Commission assumes that a condition requiring that the defendant seek and maintain gainful employment will be imposed when home detention is order." *Id.* at Background.

Accordingly, a non-custodial sentence that includes a term of home confinement and the other elements above fully satisfies the objectives of the Guidelines.

## 2.     A Non-Custodial Sentence Would Achieve Sentencing Parity

As a 22-year-old first-year analyst, Bill obtained approximately $126,000 through trades using inside information.  Imposing the non-custodial sentence that the Probation Office recommends for Bill would achieve consistency in sentencing.  Under facts similar to those of this case, numerous other individuals have received non-custodial sentences.  Sentencing Bill to a custodial sentence would create an unwarranted disparity compared to other insider traders who made similar amounts:

| *U.S. v.* | Defendant | Improper Gains[2] | Guidelines range | Sentence |
|---|---|---|---|---|
| *Goehring*, 05 CR 209 (JES) | 63-year-old corporate communications director | $94,000 | 10 to 16 months | 2 years of probation, including 5 months of home confinement |
| *Perez*, 17 CR 538 (MAS) | 28-year-old neighbor | $157,000 | Not Available | 12 months of probation |
| *Richard Yu*, 17 CR 349 (MAS) | 27-year-old friend | $200,000 | Not Available | 12 months of probation |
| *Chiang Yu*, 17 CR 348 (MAS) | 55-year-old father | $95,000 - $150,000 | Not Available | 12 months of probation |
| *Bonthu*, 18 CR 237 (AT) | 44-year-old software development manager | $76,000 | 12 to 18 months | 8 months of probation, including 8 months home confinement |
| *Blythe*, 16 CR 1842 (DMS) | 53-year old brokerage customer | $41,000 | Not Available | 5 years of probation |
| *Holzer*, 09 CR 470 (VM) | 34-year-old attorney | $175,000 | 12 to 18 months | 5 years of probation; 270 days in residential reentry |

---

[2]     Defendants' ages and gain amounts are based on publicly available PACER filings and news coverage.

18

Even in cases that involved individuals in more powerful positions, trading over a longer period of time, or for greater gains, sentencing courts still consider sentences unique to the defendant and lower than the Guidelines.  *See, e.g., U.S. v. DeCinces*, 12-CR-269 (AG) (sentencing defendant with $1 million in insider trading gains to one day in prison, eight months of home confinement, and two years of supervised release).  Imposing a custodial sentence within the Guidelines range for Bill would create an unwarranted disparity with the sentences imposed on individuals who committed insider trading with more egregious criminal conduct than Bill and who were experienced professionals (*e.g.,* attorneys, financial advisers, or vice-presidents).

### D.      The Need to Provide Restitution

Bill has consented to a criminal money judgment forfeiting all of his $125,997 in illegal gains, and a civil judgment of $100,587.31 (which will be fully reduced by the amount recovered for the criminal judgment).  The sum total of what Bill made through his conduct will be forfeited back to the United States.  The Probation Office recommends no additional restitution. *See* PSR ¶ 72.

Through the forfeiture of his brokerage account, Bill has already satisfied approximately $95,000 of this forfeiture order, leaving him with approximately $30,000 in debt to the Government.  Since October, Bill has been working two jobs and has benefited from the support of his family and his mother's presence.  *See* PSR ¶ 42 and Addendum at 18.  Bill is working to pay off his credit card debt and is also aggressively saving to pay back the remainder of what he owes the Government.  Permitting Bill to continue working would enable him to repay these debts sooner.

4840-0522-8461

V.   **<u>CONCLUSION</u>**

Bill's youth, lack of criminal history, demonstrated remorse and willingness to accept responsibility presents circumstances that warrant leniency.  Bill has a history of working hard, volunteering with those who are less fortunate, and serving as a resource for friends and other students.

Accordingly, we respectfully request that the Court impose the sentence recommended by the Probation Office:  a non-custodial sentence with a term of home confinement and extensive community service.   Such a sentence would restrict Bill's liberty while allowing him to continue working to pay the debt owed to the Government.  It would also allow him to be of service to the community and help others as he has always done.  We respectfully submit that this sentence would be just and appropriate.

Dated: New York, New York
       January 3, 2020

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

/s/  Carolina A. Fornos
Carolina A. Fornos
Mark R. Hellerer
31 West 52nd Street
New York, New York 10019
T.: (212) 858-1000
F.: (212) 858-1500
Email: mark.hellerer@pillsburylaw.com
Email: carolina.fornos@pillsburylaw.com

*Attorneys for Bill Tsai*

4840-0522-8461