UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

UNITED STATES OF AMERICA          :

   -*v.*-                                              :         19 Cr. 675 (VM)

BILL TSAI,                                          :

              Defendant.            :

---------------------------------------------------------------x


# THE GOVERNMENT'S SENTENCING MEMORANDUM

                                                                   GEOFFREY S. BERMAN
                                                                   United States Attorney
                                                                   Southern District of New York


Robert L. Boone
Gina Castellano
Assistant United States Attorneys


- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA            :

   -*v.*-                                      :        19 Cr. 675 (VM)

BILL TSAI,                                   :

              Defendant.           :

------------------------------------------------------------x

## PRELIMINARY STATEMENT

The Government writes in advance of the sentencing of defendant Bill Tsai, which is currently scheduled for January 17, 2020, at 4:30 p.m., and in response to the defendant's sentencing submission dated January 3, 2020. On September 19, 2019, the defendant pled guilty to insider trading in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2. The defendant pled guilty pursuant to a plea agreement, which contained a stipulated Guidelines range of 18 to 24 months' imprisonment. For the reasons discussed below, the Government respectfully submits that a sentence within that applicable Guidelines range is sufficient but not greater than necessary to promote the legitimate ends of sentencing.

## BACKGROUND

### A. The Defendant's Offense Conduct

As detailed in the Presentence Investigation Report, the Complaint, and the Information, Tsai abused his position as an analyst at an investment bank (the "Investment Bank") by using material, non-public information ("MNPI") obtained through the Investment Bank to make profitable securities trades in his personal brokerage account. Tsai's illegal trades resulted in a profit of approximately $98,750.

Tsai's conduct stemmed from his employment as an analyst in the Corporate Banking division of the Investment Bank. (Compl. ¶ 7.) In that role, Tsai was responsible for, among other things, updating a running list of active transactional deals, including mergers and acquisitions, involving clients of the Investment Bank. (*Id.*) As such, Tsai had access to files containing MNPI. (*Id.*)

During Tsai's employment, the Investment Bank had explicit rules on how MNPI must be handled by its employees. Specifically, the Investment Bank's written Global Information Barriers Policy made clear that "Confidential Information obtained directly or indirectly from a client . . . or any other internal or external source, may be used only for the specific purpose or transaction for which it was given. Any other use without the permission of the client which originally entrusted [the Investment Bank] with the information is a misuse and may result in disciplinary action." (Compl. ¶ 8(a).) The Policy also provided that "[n]o Employee may 'tip' or trade in a security of any issuer (or any related security) while aware of Inside Information relating to the issuer or the security (or any related security)." (*Id.*)

The Investment Bank also had rules concerning its employees' personal trading accounts. The Investment Bank's written Global Policy on Personal Trading explained that "[u]pon joining [the Investment Bank], Employees are required to disclose the existence of all Employee and Related [Trading] Accounts. Employees who have Securities Trading Accounts maintained at financial institutions other than the designated institutions referenced herein are generally required to close or transfer such accounts to a designated institution within thirty (30) calendar days of commencing employment . . . . The obligation to disclose all Employee and Related accounts continues throughout the course of employment with [the Investment Bank]." (Compl.

2

¶ 8(b).)  The Policy went on to list only two firms (collectively, the "Permitted Firms") at which its United States based employees were permitted to have a trading account.  (*Id*.)

Notwithstanding the Investment Bank's policy with respect to employee trading accounts, Tsai maintained a brokerage account at a non-Permitted Firm that he did not disclose to the Investment Bank.  (Comp. ¶ 9.)  Indeed, throughout the course of the charged scheme, Tsai maintained a securities trading account at a non-permitted brokerage firm, despite the fact that on July 12, 2018, Tsai electronically signed a Personal Accounts Disclosure Form with the Investment Bank indicating that he did not have any "employee or employee related" trading accounts.  (Compl. ¶¶ 8(c), 9.)

Tsai used his secret brokerage account and his access to MNPI to trade advantageously in the stock of Electronics for Imaging, Inc. ("EFI"), a client of the Investment Bank.  EFI was a publicly traded company that specialized in digital printing technology.  (Compl. ¶ 5.)  By at least March 11, 2019, Tsai exchanged emails and documents within the Investment Bank containing material, non-public information concerning the possible acquisition of EFI by a private equity firm headquartered in New York City ("Private Equity Firm-1").  (Compl. ¶ 11(a).)   For example, on March 13, 2019, Tsai sent an email to another employee of the Investment Bank stating, "Please see attached for EFI RWA pipeline input for your review.  Thank you."  (Compl. ¶ 11(c).)  Attached to Tsai's email was an excel spreadsheet naming EFI as a deal "In the Pipeline," and Private Equity Firm-1 as the "Deal Sponsor" for that transaction.  (*Id*.)  The transaction is described in the comments section as an "LBO," meaning a "leveraged buyout."  (*Id*.)

After learning of Private Equity Frim-1's interest in acquiring EFI, Tsai bought EFI call options.  Specifically, from March 29, 2019 to April 12, 2019, Tsai bought 187 EFI call options,

for a total price of approximately $28,410.  (Compl. ¶ 11(d).)  The call options had a strike price of $30 and an expiration date of July 19, 2019.  (*Id.*)  At the time of these purchases, EFI shares were trading below the strike price.  (*Id.*)

On or about April 15, 2019, a Monday, at approximately 8:00 a.m. Eastern Standard Time, before the market opened, EFI publicly announced that it would be acquired by an affiliate of Private Equity Firm-1.  (Compl. ¶ 11(e).)  At the close of the market of the previous trading day, April 12, 2019, EFI's stock price closed at $29.40.  (*Id.*)  By the close of the market on April 15, 2019, EFI's stock price had risen to $38 per share, an approximately 29.25% increase from the previous trading day's close.  (*Id.*)

Following EFI's announcement, and the rise in its stock price, Tsai sold all of the EFI call options he had previously purchased.  Tsai's illegal trading activity in EFI options resulted in a profit of approximately $98,750.  (Compl. ¶ 11(f).)

### B. The Charges and The Defendant's Guilty Plea

Information 19 Cr. 675 (VM) charged Tsai with participating in the insider trading scheme described above.  On September 19, 2019, the defendant pled guilty to Count One of the Information, which charged insider trading in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2, and Tsai also agreed to forfeiture of $125,997.[1]  (PSR ¶ 4.)

### C. The Applicable Guidelines

As set forth in the parties' plea agreement and by the Probation Office, the base offense level is eight; an eight-level increase is warranted pursuant to U.S.S.G. §§ 2B1.4(b)(1),

---

[1] The forfeiture amount represents both the illegal profits Tsai made with respect to the charged insider trading conduct, and the illegal profits Tsai made in relation to the uncharged insider trading conduct discussed in more detail below.

4

2B1.1(b)(1)(E), and 1B1.3, because the gain derived from the offense is more than $94,000, but less than $150,000; a two-level increase is warranted pursuant to U.S.S.G. § 3B1.3 because the defendant abused a position of private trust in a manner that significantly facilitated the commission and concealment of the offense; and a three-level decrease is warranted pursuant to U.S.S.G. § 3E1.1(a) and (b) due to the defendant's acceptance of responsibility, resulting in a total offense level of fifteen. (PSR ¶ 5.) The defendant has zero criminal history points and is in Criminal History Category I. (*Id*.). Accordingly, the applicable Guidelines range is 18 to 24 months' imprisonment. (*Id*.).

The Probation Department has recommended that Tsai be sentenced to three years' probation to include a six-month period of home confinement.

## DISCUSSION

As the Court is aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id*. at 49. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to adequately deter criminal conduct and promote respect for the law, and the need to protect the public from further crimes of the defendant. *Id*. at 50 & n.6.

Here, a Guidelines sentence is appropriate and would meet the objectives set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and

characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct.  *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(B).

### A. The Nature and Seriousness of the Offense

The seriousness of the offense here is significant.  As in any insider trading case, Tsai's conduct undermined confidence in the integrity of the financial markets, disadvantaged ordinary investors who follow the rules, and violated the confidences of the companies whose secret information he misappropriated for his own use.  Tsai's conduct was also brazen and egregious.  He misappropriated information that he had access to through his employer and then traded on that information in a brokerage account in his own name.  In addition, he lied to his employer about the existence of the brokerage account in which he made the illegal trades, despite the fact that the account had been in existence for more than three years before he began working at the Investment Bank.[2]

### B. Tsai's History and Characteristics

Tsai committed a serious crime that was fueled by his own greed.  Unlike many defendants who appear before the Court, Tsai did not commit his crime out of any pressing financial need.  Rather, by his own account, he was simply "too readily influenced by the extravagant lifestyle of some young investment banking professionals, and quickly incurred tens of thousands of dollars in credit card debt." (Def.'s Br. 1.)  Tsai's desire to live an extravagant

---

[2] Tsai opened his secret brokerage account in February 2015. (PSR ¶ 11.)  On July 12, 2018, Tsai electronically signed a Personal Accounts Disclosure Form with the Investment Bank indicating that he did not have any "employee or employee related" trading accounts. (PSR ¶ 10.)

lifestyle is obviously not a mitigating factor, and instead speaks directly to his greed and sense of entitlement. Moreover, Tsai's conduct was not a brief aberration. As discussed below, on multiple occasions Tsai used his position at the Investment Bank to make illegal trades and/or cause others to make illegal trades.

   1. *The ITG Deal*

Tsai first misappropriated MNPI obtained from his job at the Investment Bank in the Fall of 2018. In October 2018, the Investment Bank was working to provide financing to a company called Virtu Financial, Inc. ("Virtu") on its possible acquisition of a company named Investment Technology, Group, Inc. ("ITG," and the transaction, the "ITG Deal"). Information relating to the ITG Deal, including its existence, was non-public and confidential. By at least October 22, 2018, Tsai was aware of the potential acquisition of ITG, as he began exchanging emails and documents on that date within the Investment Bank containing material, non-public information concerning the ITG Deal. Specifically, on or about October 22, 2018, Tsai received an email asking him to "help" on the ITG deal. The email to Tsai forwarded other, earlier emails, including: (i) an October 3, 2018 email stating: "Virtu ($4 billion market cap) has asked us to be one of 2 financing sources for their $1+ billion acquisition of ITG;" and (ii) an October 20, 2018 email stating: "We received clearance to be brought in on this Virtu deal . . . . They want to announce the deal by November 7th."

Shortly after Tsai became aware of the ITG deal, he tipped a relative ("Relative-1"), who in turn began purchasing shares of Virtu. Specifically, on Friday, November 2, 2018, at approximately 8:32 p.m., Relative-1 placed an order to buy 168 shares of Virtu. Given that Relative -1's order was placed after the market closed, Relative-1's order would be executed when the market reopened on Monday, November 5, 2018. Clearly, in purchasing over 100

7

shares of Virtu stock, Relative-1 was trying to advantageously trade on the MNPI Tsai provided Relative-1 regarding the ITG deal. However, Relative-1 had made a mistake. To maximize Relative-1's illegal profits, Relative-1 needed to purchase stock in the company being acquired in the ITG deal, ITG, not the acquiring company, Virtu.

On Sunday, November 4, 2018, the night before Relative-1's Virtu order was to be executed, Relative-1 and Tsai spoke on the phone. Relative-1 initially called Tsai's cellphone at approximately 10:55 a.m., but Relative-1's call went to voicemail. A little less than an hour later, at approximately 11:47 a.m., Tsai returned Relative-1's call, and the two spoke for approximately eight minutes. Although the Government cannot say with certainty what was discussed on that call, the evidence suggests that Tsai informed Relative-1 that Relative-1 should have used the MNPI Tsai provided Relative-1 to purchase stock in ITG, not Virtu. Indeed, following that phone call, Relative-1 quickly sold all the shares Relative-1 had just purchased in Virtu, and immediately began purchasing shares of ITG.

Specifically, on Monday, November 5, 2018, at approximately 9:30 a.m., Relative-1's purchase order of Virtu shares was executed, and about thirty minutes later, at approximately 10:01 a.m., Relative-1 sold all 168 shares of Virtu Relative-1 had just purchased. Almost immediately, at approximately 10:03 a.m., Relative-1 then bought 147 shares of ITG. The next day, Tuesday, November 6, 2018, at approximately 6:54 a.m., Relative-1 placed an order to buy 72 more shares of ITG. At approximately 9:34 a.m., Relative-1 bought 73 additional shares of ITG.

As soon as the ITG deal was publicly announced, Relative-1 sold all of Relative-1's ITG shares for a profit. Virtu publically announced that it would acquire ITG on November 7, 2018, at approximately 6:10 a.m., before the market opened. That same morning, at approximately

10:18 a.m., Relative-1 sold 147 ITG shares resulting in a profit of approximately $354.28. The next day, November 7, 2018, at approximately 10:54 a.m., Relative-1 sold his/her remaining 145 ITG shares resulting in a profit of approximately $286.40.

    *2. The Shutterfly Deal*

In the Spring of 2019, Tsai again misappropriated MNPI he obtained from his job at the Investment Bank. In April 2019, the Investment Bank was working to provide financing to Apollo Global Management, LLC ("Apollo") on its possible acquisition of Shutterfly Inc. ("Shutterfly," and the transaction, the "Shutterfly Deal"). Information relating to the Shutterfly Deal, including its existence, was non-public and confidential. By at least April 29, 2019, Tsai was aware of the potential acquisition of Shutterly, as he began exchanging emails and documents on that date within the Investment Bank containing material, non-public information concerning the Shutterfly Deal. Specifically, on or about April 29, 2019, Tsai received an email invite to the "Tech Weekly Portfolio Meeting." The invite included an attachment entitled "Tech US: Weekly Tracker," which listed "Shutterfly (Apollo)" under the column entitled "client," and listed the "Nature of Assignment" as an "LBO," meaning "leveraged buyout." On May 8, 2019, Tsai received an email from another employee of the Investment Bank with an attachment that included the Shutterfly Deal, which was identified by a project name, as "In the Pipeline."

Shortly after Tsai became aware of the Shutterfly deal, he started purchasing Shutterfly call options. Starting on May 10, 2019, and continuing until May 20, 2019, Tsai bought Shutterfly call options using his secret brokerage account. Specifically, Tsai bought 200 Shutterfly call options, for a total price of approximately $51,450. The call options had a strike price of $47.50 and an expiration date of July 19, 2019. At the time of these purchases, Shutterfly shares were trading below the strike price.

Tsai also tipped Relative-1 about the Shutterfly deal. On May 14, 2019, Relative-1 bought 1,671 shares of Shutterfly. Specifically, Relative-1 bought 367 shares of Shutterfly, at an average price of $43.94 per share, and 1,304 shares of Shutterfly, at an average price of $43.99 per share, for a total price of approximately $73,488.

On Friday, May 17, 2019, a public news article reported, in substance and in part, that Shutterfly was likely to be acquired in the near future. Tsai and Relative-1 then quickly sold all of their interest in Shutterfly. On Tuesday, May 21, 2019, at approximately 3:48 p.m., Tsai sold all 200 Shutterfly call options in his secret brokerage account, resulting in a profit of approximately $26,548. Approximately ten minutes later, at approximately 3:59 p.m., Relative-1 sold all 1,671 of Relative-1's Shutterfly shares for a profit of approximately $8,350.[3]

Accordingly, within the first 11 months of Tsai's employment at the Investment Bank, he orchestrated three different insider trading schemes. His conduct was brazen, calculated, and pervasive. He clearly had no regard for the duties owed to his employer and its clients, despite his suggestion that he greatly appreciated the opportunity to work at a premier Wall Street firm. (*See* Def. Br. 7.)

C. <u>The Need for Deterrence and Promote Respect for the Law</u>

The fact that Tsai orchestrated three different insider trading schemes within his first year working in the financial services industry makes plain the need to impose a Guidelines sentence to afford specific deterrence and promote respect for the law.

But general deterrence is also particularly important. Because insider trading schemes are both highly lucrative and difficult to detect, significant punishment is necessary to deter

---

[3] From May 24, 2019 to May 29, 2019, Relative-1 continued to trade in Shutterfly shares. Relative-1 did not profit from these trades. On June 10, 2019, Shutterfly publically announced that it had agreed to be acquired by affiliates of certain funds managed by Apollo.

others from similar conduct. *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). Should Tsai receive a light sentence, financial professionals, particularly junior ones, may be emboldened to engage in similar crimes, knowing that such schemes are difficult to detect and that even if they are caught, they will not face significant jail time. In addition, such a sentence would further erode the public's confidence in the integrity of the public markets by sending the message that even when financial professionals are caught engaging in white collar crimes, they are only lightly punished. To deter criminal conduct by professionals like Tsai, effectuate the purpose of the securities fraud laws, and send an appropriate message that this type of fraud will not be tolerated, a sentence within the Guidelines range is warranted.

In an attempt to persuade the Court that despite Tsai's year-long insider trading spree, he should be given a non-custodial sentence, Tsai points to several cases he claims have facts similar to those in the instant matter where the defendant received probation. (*See* Def. Br. 18.) However, even a cursory review of those cases makes clear that there are distinct differences between Tsai and the defendants in those cases. For starters, none of the defendants Tsai points to were investment banking professionals whose jobs entailed dealing with MNPI regarding mergers and acquisitions on a daily basis. Tsai's entire job revolved around keeping confidential transactions a secret. As such, the level of trust Tsai was entrusted with by his employer regarding MNPI, and his repeated failure to honor that trust, is simply not comparable to the actions of the defendants to which Tsai cites, none of whom were investment banking professionals, and most of whom were merely tip recipients. Moreover, it does not appear that

11

any of the defendants Tsai points to orchestrated three different insider trading schemes in less than a year. With respect to that feat, Tsai likely has few peers.

## **CONCLUSION**

For the aforementioned reasons, the Government respectfully submits that a Guidelines sentence is appropriate in this case and sufficient but not greater than necessary to promote the legitimate ends of sentencing.

Dated: New York, New York
January 10, 2020

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: s/ Robert L. Boone
Robert L. Boone
Gina Castellano
Assistant United States Attorneys
(212) 637-2208/2224